# CEDAR MOUNTAIN, LLC *v.* D AND M SCREW MACHINE PRODUCTS, LLC
## (AC 32891)

Lavine, Alvord and Espinosa, Js.

Argued February 14—officially released May 8, 2012

*John C. Matulis, Jr.*, for the appellant-appellee (plaintiff).

*Kenneth J. Speyer*, for the appellee-appellant (defendant).

*Opinion*

ALVORD, J. This action involves a commercial lease of a building and 8.9 acres of land in Newington. The plaintiff, Cedar Mountain, LLC, appeals from the judgment of the trial court, rendered after a three day court trial. On appeal, the plaintiff claims that the court improperly (1) failed to award it contractual interest on the damages that the court determined were caused by the breach of the lease agreement by the defendant, D & M Screw Machine Products, LLC, and (2) awarded damages to the defendant on its counterclaim. The defendant cross appeals from the judgment, claiming that the court improperly (1) concluded that the defendant breached the lease agreement, (2) awarded the plaintiff attorney's fees, (3) awarded the plaintiff costs and (4) failed to award the total amount of damages sought by the defendant on its counterclaim. We affirm the judgment of the trial court.

The following facts were found by the court or are not disputed. In December, 1998, the parties entered into a lease agreement for approximately nine acres of land in Newington with a building to be used by the defendant for the operation of a machine shop and related activities. At that time, the plaintiff actively was trying to sell the property and had posted a "for sale" sign on the premises. With that understanding, the parties agreed to a seven year lease term, with no option to renew, that commenced on January 1, 1999, and terminated on December 31, 2005. The lease expressly provided for an early termination in the event of the sale of the leased premises. The plaintiff, as landlord, was entitled to terminate the lease upon six months written notice to the defendant, as tenant, from the date of conveyance. Partially because of the early termination provision, the defendant was to pay a nominal $10 per year as rent. Additionally, the lease provided that the defendant was obligated to pay all real estate taxes, liability insurance premiums and utility bills, and was responsible for maintenance of and repairs to the leased premises.

Charles Lowe, the plaintiff's managing member, had a real estate broker's license and, in addition to marketing the *plaintiff's* property, offered to assist the *defendant* in locating a suitable building for the relocation of its business when the leased premises were sold. He and Denis Morin, a member of the defendant limited liability company, looked at potential sites in the summer of 2002 in anticipation of the sale of the property and the early termination of the lease. Although the plaintiff did not have a signed contract of sale at that time, there was a potential buyer, and Lowe commenced environmental remediation work at the site.

On August 3, 2002, there was an electrical fire at the leased premises. At the time of the fire, the building had a 400 ampere electrical system. Although the fire

had been confined to the area of the main electrical box, it was necessary to shut off the power to the entire building. The electricity could not be restored until repairs were made, and, therefore, the defendant was unable to operate its business for several weeks. Lowe decided that a 200 ampere electrical system would be sufficient for the building and made arrangements for the repairs. Although both the town's electrical inspector and Morin expressed concerns about replacing the 400 ampere system with a 200 ampere system, Lowe proceeded to have the 200 ampere system installed. By letter dated September 6, 2002, Lowe advised the town's electrical inspector that the new 200 ampere system had been installed, upon the "recommendation" of Connecticut Light and Power Company, and that "[t]here is a buyer for the land and the building will be demolished within a year."

Shortly thereafter, the defendant experienced problems with the adequacy of the new electrical system.[1] Morin frequently complained to Lowe that fuses were being blown and that he needed additional electrical power to run his machines. On November 4, 2002, Lowe offered Morin the opportunity to be released from the balance of the term of the lease agreement. Morin declined the offer and expressed no desire to leave the premises before the lease terminated. Lowe then contacted an electrical contractor and had a 400 ampere system installed to satisfy the electrical demands of the defendant.

The plaintiff's actions in restoring power after the fire and then replacing the initially installed 200 ampere electrical system with a 400 ampere electrical system were voluntarily assumed and were taken for the purpose of keeping the defendant as a tenant in the leased

---

[1] At about that time, the defendant's business improved and it rehired an employee who had been laid off to help operate its machines.

premises. All of the electrical repair and replacement costs were paid by the plaintiff. As acknowledged by Lowe, it was in the plaintiff's best interest to keep a tenant in the building while the property was being marketed for sale and to have that tenant responsible for the payment of real estate taxes, insurance, repairs and maintenance. Until the plaintiff restored the electrical power to the level that preceded the fire, however, the defendant suffered a period of diminished operations and production.

The newly installed 400 ampere electrical system was operational by mid-January, 2003. At that point in time, the plaintiff still was actively pursuing a buyer and continued to post the "for sale" sign on the premises.[2] Further, the defendant's business improved, and its use of the building and parking spaces was being affected adversely by the environmental cleanup at the site. Accordingly, the defendant continued to explore the possibility of relocating its operation, and, in January, 2003, it signed a purchase agreement for a new building. The defendant did not notify the plaintiff that it had signed the purchase agreement. On November 25, 2003, the defendant sent a letter to Lowe by certified mail notifying him that the electrical and gas service at the leased premises would be disconnected on December 5, 2003, and that the liability insurance would be discontinued as of November 26, 2003. The defendant subsequently returned all of the keys to the leased premises in a letter to Lowe dated January 3, 2004.

On January 5, 2009, the plaintiff commenced the present action against the defendant. The one count complaint alleged that the defendant breached the lease agreement by failing to make payments for real estate taxes, electrical work and repairs, liability insurance

[2] The potential buyer from the summer of 2002 never signed a contract, and the anticipated sale did not come to fruition.

and trash removal. The plaintiff sought money damages, interest, costs and attorney's fees as provided for in the lease agreement. The defendant filed an answer, several special defenses and a counterclaim. The defendant's principal claim was that the plaintiff's adverse actions and the condition of the leased premises resulted in the defendant's constructive eviction from the premises.

During the trial in May, 2010, the court heard testimony from Lowe, Denis Morin, Linda Morin, who also is a member of the defendant limited liability company, and Edward Ingalls of the Newington Electric Company. The court also admitted more than forty exhibits. On the last day of trial, the plaintiff's counsel requested and was granted permission by the court to file an application for attorney's fees within one week of the filing of the parties' posttrial briefs. On July 15, 2010, the parties simultaneously filed comprehensive posttrial briefs summarizing their respective positions. On July 16, 2010, the plaintiff filed an application for attorney's fees and costs, together with an affidavit of counsel in support of that application.[3] The defendant filed an objection to the request for attorney's fees on July 21, 2010.[4]

On October 26, 2010, the court issued its amended memorandum of decision.[5] After setting forth the parties' claims and making several factual findings, the

[3] On August 11, 2010, the plaintiff filed an amended application for attorney's fees and costs with an amended affidavit by the plaintiff's counsel. In the amended application, the representation was made that a deposition fee was included erroneously in the original application. The amended application deducted the deposition fee, thereby reducing the total amount claimed by the plaintiff as attorney's fees.

[4] A hearing on the application and objection was held on November 9, 2010.

[5] The court's initial memorandum filed on September 15, 2010, contained a minor error in the computation of the plaintiff's damages for nonpayment of rent. The defendant filed a motion for articulation and a motion to reconsider, modify or reargue the decision on October 5, 2010. The court sent notices to the parties on October 26, 2010, informing them that the amended memorandum of decision constituted the court's rulings on those motions.

court determined that the defendant breached the lease agreement by vacating the premises before the sale of the property or the end of the lease term. The court concluded that some of the plaintiff's actions, particularly with respect to the replacement of the 400 amperage electrical system with a 200 amperage electrical system immediately after the fire, resulted in damages to the defendant's business, but that those actions did not rise to the level of breaching the lease agreement by the plaintiff. The court found in favor of the plaintiff on its complaint in the amount of $62,257.47, and found in favor of the defendant on its counterclaim in the amount of $31,980, which was credited toward the plaintiff's damages. The court rendered judgment accordingly, without costs to either party. This appeal and cross appeal followed.

The defendant filed a motion for articulation, dated January 19, 2011, requesting that the court articulate its decision by stating the manner in which it determined the amount awarded on the defendant's counterclaim. The court filed an articulation, and the defendant filed a motion for review of the articulation with this court. We granted the motion for review and granted the relief requested. In response, the trial court made the following articulations in an amended articulation dated May 2, 2011: (1) the defendant proved that it was damaged to the extent of $63,960 as a result of the electrical fire; (2) the defendant was liable for repairs to the leased premises under the terms of the lease but failed to make the electrical system repairs that were necessitated by the fire; (3) because the defendant was responsible for repairs under the lease, the defendant could have installed a 400 ampere electrical system immediately after the fire but instead allowed the plaintiff to assume the responsibility for the repairs to the electrical system; (4) the plaintiff assumed responsibility for the electrical repairs and contacted the utility

company to determine the defendant's electrical power needs; (5) a representative of the utility company indicated that a 200 ampere electrical system would be adequate for the defendant's needs on the basis of the defendant's prior usage history; (6) after the plaintiff installed the 200 ampere electrical system, the defendant's business improved and the newly installed system did not meet the defendant's needs; (7) the defendant then requested that the 200 ampere electrical system be replaced with a 400 ampere electrical system, and the plaintiff complied with the defendant's request; and (8) the parties were equally at fault for the defendant's damages and, therefore, the court divided $63,960 by half to reach the amount of $31,980 that the court awarded on the counterclaim.

On May 31, 2011, the court issued its decision with respect to the plaintiff's request for attorney's fees and costs. After stating that the plaintiff's claim was based on a provision in the lease allowing their recovery, the court awarded the plaintiff $12,675 in attorney's fees plus costs in the amount of $1793.52, for a total of $14,468.52. The court found this amount, which was the amount requested by the plaintiff in its amended application for attorney's fees and costs, to be reasonable and consistent with the experience, background and results obtained by the plaintiff's counsel. In a footnote, the court noted that, although it had not granted costs in its October 26, 2010 amended memorandum of decision, it had given the plaintiff permission to file a motion for attorney's fees and costs in a subsequent proceeding. For that reason, the court determined that its ruling was not inconsistent with its prior decision. On June 10, 2011, the defendant filed an amended cross appeal to include the court's ruling with respect to attorney's fees and costs.

On June 20, 2011, the plaintiff filed a motion for articulation requesting that the trial court state its basis

for (1) awarding the defendant damages on its counterclaim when the lease expressly provided that the plaintiff would not be liable to the defendant for any loss of business due to power losses or shortages and (2) declining to award the plaintiff interest at 18 percent as provided for in the lease agreement. The court filed its articulation on July 25, 2011, stating that it had determined that the plaintiff waived the provision of the lease pertaining to loss of business damages when it voluntarily assumed the responsibility to restore the electrical service after the fire. The court further stated that because the plaintiff voluntarily arranged to have the repairs made to the electrical system, it was not entitled to recover the expenditures it made in effecting those repairs or the contractual interest specified in the lease with respect to those repairs. The plaintiff did not file a motion for review of that articulation with this court.

With this factual and procedural background in mind, we turn to the claims set forth in the plaintiff's appeal and the defendant's cross appeal.

I

PLAINTIFF'S APPEAL

A

The plaintiff's first claim on appeal is that the court improperly declined to award it contractual interest at 18 percent on the damages awarded by the court. Citing *Guaranty Bank & Trust Co.* v. *Dowling*, 4 Conn. App. 376, 386, 494 A.2d 1216, cert. denied, 197 Conn. 808, 499 A.2d 58 (1985), the plaintiff argues that the court was *required* to award it interest on the damages because the payment of interest was contractually

agreed upon in the lease agreement.[6] The plaintiff claims that the court, although explaining why it declined to award interest on the plaintiff's expenditures to repair and replace the electrical system, failed to explain why interest had not been awarded on the recovered amounts for unpaid rent, real estate taxes and liability insurance premiums.

In its October 26, 2010 amended memorandum of decision, the court determined that the amount of damages proved by the plaintiff on its complaint totaled $62,257.47. That amount consisted of $20 for unpaid rent, $60,126.26 for unpaid real estate taxes and $2111.21 for unpaid insurance premiums. The court, however, did not order the defendant to reimburse the plaintiff for its expenses related to the repairs and replacement of the electrical system, although the plaintiff had claimed those expenditures as damages at trial. The plaintiff has not challenged that determination on appeal.

Because the court did not award damages to the plaintiff for the electrical repairs, a fortiori, no interest could be awarded on those claimed damages. The court provided a lengthy articulation on July 25, 2011, with respect to its decision not to award contractual interest on the plaintiff's electrical repair expenditures.[7] With respect to the amounts that the court did award the plaintiff for the defendant's breach of the lease agreement, i.e., unpaid rent, real estate taxes and insurance premiums, the plaintiff acknowledges that the July

---

[6] We note that even contractual interest would not be recoverable if usurious or a penalty. See *Bellemare* v. *Wachovia Mortgage Corp.*, 284 Conn. 193, 203, 931 A.2d 916 (2007); *Little* v. *United National Investors Corp.*, 160 Conn. 534, 537–38, 280 A.2d 890 (1971); *Cadle Co.* v. *D'Addario*, 131 Conn. App. 223, 248–49, 26 A.3d 682 (2011).

[7] The court's October 26, 2010 amended memorandum of decision simply states that "the court does not award interest on . . . damages to either party."

25, 2011 articulation did not address recovery of interest on those damages.[8] Nevertheless, the plaintiff did not file a motion for review of that articulation with this court. See Practice Book § 66-6.

It was the plaintiff's burden to provide this court with an adequate record for our review. See *Chase Manhattan Bank/City Trust* v. *AECO Elevator Co.*, 48 Conn. App. 605, 607, 710 A.2d 190 (1998); Practice Book § 61-10. "It is incumbent upon the appellant to take the necessary steps to sustain its burden of providing an adequate record for appellate review. . . . [A]n appellate tribunal cannot render a decision without first fully understanding the disposition being appealed. . . . Our role is not to guess at possibilities, but to review claims based on a complete factual record developed by a trial court." (Internal quotation marks omitted.) *Heaven* v. *Timber Hill, LLC*, 96 Conn. App. 294, 312, 900 A.2d 560 (2006). Without the necessary factual and legal conclusions furnished by the trial court with respect to its decision not to award contractual interest on damages for unpaid rent, real estate taxes and insurance premiums, any decision made by us respecting the plaintiff's claim would be entirely speculative. See id.

B

The plaintiff next claims that the court improperly awarded damages to the defendant on its counterclaim. It argues that a provision in the lease expressly provided that the plaintiff would not be liable to the defendant for any business losses due to power losses or shortages. The plaintiff further claims that if such damages are recoverable under the lease, the court nevertheless

---

[8] In its appellate brief, the plaintiff states that the court's reasoning in its articulation "ignores the fact that the [defendant] was obligated to the [plaintiff] for numerous other expenses which were not affected whatsoever by . . . the electrical service . . . ."

improperly calculated the amount by using the defendant's loss of gross revenue as the measure of actual damages.

1

Paragraph 7 of the lease agreement included a provision that the plaintiff claims precluded the defendant from recovering damages on its counterclaim. The relevant portion of the paragraph provides: "Landlord shall not be liable to Tenant for any compensation or reduction of rent by reason of the inconvenience or annoyance or for loss of business arising [from] . . . power losses or shortages . . . ." In the court's July 25, 2011 articulation, it stated that the plaintiff had waived that provision of the lease when it voluntarily assumed the responsibility to restore the electrical system after the fire and made all of the arrangements for the repairs.

"Waiver involves an intentional relinquishment of a known right. . . . There cannot be a finding of waiver unless the party has both knowledge of the existence of the right and intention to relinquish it. . . . Waiver may be inferred from the circumstances if it is reasonable so to do. . . . Whether conduct constitutes a waiver is a question of fact . . . [and is] dependent on all of the surrounding circumstances and the testimony of the parties." (Internal quotation marks omitted.) *Esposito* v. *DiGennaro*, 120 Conn. App. 627, 630, 992 A.2d 1230 (2010). We therefore will not disturb the trial court's finding of waiver unless it is clearly erroneous. Id., 631.

We conclude that the record supports the court's finding of waiver. Lowe testified that he wanted to keep the defendant as a tenant after the fire, and he therefore made arrangements to replace the failed electrical service with a 200 ampere system as quickly as possible. The town's electrical inspector and Denis Morin both expressed to Lowe their concerns about the adequacy

of a 200 ampere system for that building. Additionally, Ingalls, a licensed electrician with the Newington Electric Company, the company that installed the new 200 ampere system, testified that he told Lowe that he had concerns about the adequacy of a 200 ampere system. Lowe convinced Ingalls, however, that the reduced power would not be a problem because only a few machines would be operating in the building. After Lowe had the 200 ampere system installed and the defendant experienced problems with blown fuses, Ingalls wrote a letter to Lowe. Ingalls stated that, despite the previous representations made to him by Lowe, the system clearly was being overloaded and that Lowe needed to increase the power of the electrical service. At that point, with the increasing complaints of Denis Morin, Lowe made arrangements to replace the inadequate 200 ampere system with a 400 ampere system. The plaintiff paid for the electrical repairs and replacement; Denis Morin testified that he never offered to pay for those repairs or to share in the expense.

There was no evidence that the plaintiff ever demanded that the defendant pay for the electrical repairs necessitated by the fire in August, 2002. In fact, the undisputed testimony of both parties was that the plaintiff arranged and paid for the repairs because it was in the plaintiff's interest to do so. Nevertheless, one of the plaintiff's claims at trial was that it should be reimbursed for those expenditures because the lease required all repairs to be made by the defendant. The court concluded that the voluntary assumption of those responsibilities by the plaintiff constituted a waiver of the lease provision that required the defendant to make repairs and of the lease provision precluding the defendant's recovery for loss of business due to power losses or shortages.[9] Under these circumstances, we cannot

___

[9] We note that "[o]ne who undertakes to do an act gratuitously is still required to use reasonable care." D. Wright, J. Fitzgerald & W. Ankerman, Connecticut Law of Torts (3d Ed. 1991) § 30, p. 50; see *Coville* v. *Liberty*

conclude that the court's finding of waiver was clearly erroneous.[10]

2

The plaintiff claims that if paragraph 7 of the lease agreement did not preclude the defendant's recovery of damages on its counterclaim, the court nevertheless erred in its calculation of those damages by using the defendant's loss of gross revenue as the measure of actual damages. Specifically, it argues that there was no testimony at trial regarding the defendant's lost profits, which would be the proper measure of damages for the claimed losses. Absent testimony as to lost profits, the plaintiff claims that the evidence presented represented the loss of the defendant's gross revenue for the period of time during which productivity suffered for lack of an adequate electrical system.

At trial, Linda Morin testified that she did most of the bookkeeping and all of the office managerial work for the defendant. She testified that during the defendant's downtime, which began August 3, 2002, and lasted until January 16, 2004, the defendant lost 3198

*Mutual Ins. Co.*, 57 Conn. App. 275, 282, 748 A.2d 875 ("[o]ne who gratuitously undertakes a service that he has no duty to perform must act with reasonable care in completing the task assumed"), cert. granted on other grounds, 253 Conn. 919, 755 A.2d 213 (2000) (appeal withdrawn March 30, 2001).

[10] The plaintiff also claims that the parties' parol modification of the lease agreement with respect to its assuming the responsibility of making electrical repairs did not extend to a modification of the provision precluding the defendant's recovery of loss of business damages. Simply put, parol modification does not apply to the circumstances of this case. A parol modification requires that both parties to a contract agree to alter a particular contractual provision. See *Herbert S. Newman & Partners, P.C.* v. *CFC Construction Ltd. Partnership*, 236 Conn. 750, 761–62, 674 A.2d 1313 (1996). Although Lowe testified that Denis Morin was "happy" that the 200 ampere electrical system was installed immediately after the fire, the court found that the defendant "insist[ed] that a 400 [ampere] service should be reinstalled" but that the plaintiff nevertheless decided to install the 200 ampere system.

hours of production.[11] She stated that the figure was calculated by "logg[ing] each machine" and putting a notation of "NP" on a log or chart,[12] which meant no power, whenever a particular machine was not operating because of inadequate power. Further, according to her testimony, "[t]he machines are averaged to make about $20 an hour. So, over the course of time, we lost almost $64,000. I think it was more like $63,960 . . . ." Several times she referred to the loss as "loss of production."

In its posttrial brief, the defendant made the statement that "[t]he plaintiff does not dispute the dollar amounts . . . only whether the plaintiff is liable for the damages claimed." It further characterized the testimony of Linda Morin as follows: "The defendant testified, without contradiction or challenge, that the average *profit* for each hour of machine operation is twenty ($20) dollars per hour. Thus, the defendant testified and the [e]xhibit shows *lost profits* equaling $63,960, directly caused by the plaintiff's insistence upon an inadequate electrical repair." (Emphasis added.) In its posttrial brief, the plaintiff argued that the provision in the lease precluded the defendant's recovery for lost production. It further argued that the chart did not reflect "interruptions typically encountered in a production screw machine shop" and that "the [d]efendant's own tax returns contradict the claim that [it] lost money on sales due to the electrical problems." The plaintiff did not challenge Linda Morin's trial testimony on the ground that she referred to gross revenue rather than lost profits as the measure of damages.[13]

[11] The defendant did not keep records of the downtime prior to October 29, 2002. The damages sought on its counterclaim, therefore, were limited to a calculation from October 29, 2002, through January 16, 2003.

[12] The log or chart was admitted as a full trial exhibit.

[13] We note that Lowe testified that Denis Morin had been his employee for nineteen years when Lowe ran the family business. Lowe further testified that he was familiar with the leased building and the operation of the defendant's business.

In its October 26, 2010 amended memorandum of decision, the court found that "the negative actions of the plaintiff damaged the defendant in lost productivity resulting from the plaintiff's installation of the reduced electrical power supply for the period after the installation of the 200 [ampere] service by the plaintiff until its replacement with the 400 [ampere] service." The court also found that the defendant "suffered damage as a result of the plaintiff's actions that were detrimental to the defendant's operation and the expansion of its business when the plaintiff voluntarily assumed the responsibility for repairs to the electrical power system and installed an electrical power supply that was less than provided before the occurrence of the fire on the premises." The court then found in favor of the defendant on its counterclaim in the amount of $31,980, without ever characterizing the amount as lost revenue or lost profits. When the defendant requested an articulation as to the manner in which the court calculated its damages, the court stated that the defendant "proved that it was damaged" to the extent of $63,960, and that the defendant's "damages resulting from the plaintiff's actions" amounted to $31,980, because both parties were equally at fault.

Although Linda Morin testified as to lost production, the general language that she used in describing the defendant's damages did not include the term "lost profits." The defendant's counsel characterized her testimony as referring to lost profits. The court accepted the calculations provided by the defendant in testimony and by exhibit, but failed to describe the amount awarded on the defendant's counterclaim as either lost profits or loss of gross revenue. The plaintiff did not request an articulation from the court as to its calculation of the counterclaim damages. Its request for articulation focused solely on the lease provision that it claimed precluded the defendant from recovering any

counterclaim damages. Our careful review of the record reveals that the first time the plaintiff has claimed that the court used loss of gross revenue to calculate the actual damages is in its appellate brief.

Accordingly, we decline to review the plaintiff's claim that the court improperly calculated the defendant's counterclaim damages by treating loss of gross revenue as the measure of actual damages.[14] The plaintiff did not present that theory to the trial court. "[A] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . ." (Citation omitted; internal quotation marks omitted.) *Ingels* v. *Saldana*, 103 Conn. App. 724, 730, 930 A.2d 774 (2007). "For this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [court] and to the opposing party." (Internal quotation marks omitted.) *Gilbert* v. *Beaver Dam Assn. of Stratford, Inc.*, 85 Conn. App. 663, 680, 858 A.2d 860 (2004), cert. denied, 272 Conn. 912, 866 A.2d 1283 (2005).

II

DEFENDANT'S CROSS APPEAL

A

The defendant's first claim is that the court improperly determined that the defendant, rather than the plaintiff, breached the lease agreement. The defendant argues that the evidence at trial demonstrated that the

---

[14] The plaintiff also claimed that the court's calculation of damages was improper because the defendant's evidence at trial "overstated the productivity of each machine." Its argument is less than one page in length and cites no case law. This claim is inadequately briefed, and we decline to afford it review. "Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Internal quotation marks omitted.) *Bicio* v. *Brewer*, 92 Conn. App. 158, 172, 884 A.2d 12 (2005).

plaintiff (1) waived the provisions of the lease to allow the defendant to vacate the premises before the termination date and (2) constructively evicted the defendant from the leased premises.

1

"The determination of whether a contract has been materially breached is a question of fact that is subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *D'Angelo Development & Construction Corp.* v. *Cordovano*, 121 Conn. App. 165, 176–77, 995 A.2d 79, cert. denied, 297 Conn. 923, 998 A.2d 167 (2010). Further, "[w]hether conduct constitutes a waiver is a question of fact"; (internal quotation marks omitted) *Esposito* v. *DiGennaro*, supra, 120 Conn. App. 630; and a trial court's finding with respect to a claimed waiver is likewise subject to the clearly erroneous standard of review. See id., 631.

The defendant argues that the testimony of Denis Morin and Linda Morin proved that the plaintiff gave notice to the defendant on September 6, 2002, that the lease was terminated and that they were required to vacate the leased premises within six months of that date.[15] The defendant further argues that Lowe's actions and comments to Denis Morin and Linda Morin prior to and subsequent to September 6, 2002, also proved that the plaintiff directed the defendant to vacate the premises prior to the termination date of the lease.

---

[15] The purported notice of termination was a letter addressed to the town's electrical inspector advising him that a new 200 ampere electrical system had been installed at the leased premises and that "[t]here is a buyer for the land and the building will be demolished within a year."

These actions, according to the defendant, constitute the plaintiff's waiver of the lease term provisions.

The evidence submitted by the plaintiff, however, contradicted the defendant's evidence. Lowe testified that, although he did ask Denis Morin on November 4, 2002, whether he wanted an early termination of the lease, Morin expressly stated that he had no desire to leave the premises at that time. Lowe testified that, given that response, he immediately contacted an electrical contractor and replaced the 200 ampere system with the 400 ampere electrical system to satisfy the defendant's electrical demands. Lowe stated that he paid for the replacement electrical system because it was in the plaintiff's best interest to keep the defendant as a tenant in the property until it was sold. Lowe also testified that after November 4, 2002, he never offered the defendant an opportunity to vacate the leased premises prior to its termination date.

The trial court's factual findings that the plaintiff did not waive the termination date of the lease and that the defendant therefore breached the lease agreement by vacating the leased premises before the sale of the property or the end of the lease term were not clearly erroneous. Those findings involved credibility determinations by the court. The defendant's argument is nothing more than an attempt to retry the facts. "We cannot retry the facts or pass on the credibility of the witnesses." (Internal quotation marks omitted.) *Porter* v. *Morrill*, 108 Conn. App. 652, 664, 949 A.2d 526, cert. denied, 289 Conn. 921, 958 A.2d 152 (2008).

2

The defendant further argues that the court improperly found that it had breached the lease agreement because the plaintiff had constructively evicted the defendant from the leased premises. The defendant's claim has no merit.

"[A] constructive eviction arises where a landlord, while not actually depriving the tenant of possession of any part of the premises leased, has done or suffered some act by which the premises are rendered untenantable, and has thereby caused a failure of consideration for the tenant's promise to pay rent. . . . In addition to proving that the premises are untenantable, a party pleading constructive eviction must prove that (1) the problem was caused by the landlord, (2) the tenant vacated the premises because of the problem, and (3) the tenant did not vacate until after giving the landlord reasonable time to correct the problem. . . . Moreover, [w]hether the premises are untenantable is a question of fact for the trier . . . ." (Citations omitted; internal quotation marks omitted.) *Welsch* v. *Groat*, 95 Conn. App. 658, 662, 897 A.2d 710 (2006).

The court's findings, as supported by the record, were that the plaintiff immediately undertook to arrange and pay for repairs after the electrical fire, that it replaced the 200 ampere system with a 400 ampere system when the defendant indicated it did not want an early termination of the lease in November, 2002, that the 400 ampere system was installed and operational by mid-January, 2003, that the defendant signed a purchase agreement for a new building in January, 2003, without notifying the plaintiff and that the defendant thereafter elected to vacate the leased premises *after* a system adequate for its electrical needs had been installed. It was not clearly erroneous for the court, under these circumstances, to reject the defendant's claim that it had been constructively evicted from the leased premises.

B

The defendant's next claim is that the court improperly awarded the plaintiff attorney's fees pursuant to the lease agreement. The defendant challenges the court's award on several grounds, claiming that the court (1)

should not have awarded any attorney's fees because the plaintiff failed to give notice as required by the lease agreement, (2) improperly awarded attorney's fees for work not covered by the attorney's fee provision in the lease agreement and (3) failed to exercise discretion in awarding attorney's fees. We disagree.

1

The defendant's first claim with respect to the award of attorney's fees is that paragraph 19 of the lease agreement required the plaintiff to give notice of the defendant's default before it could request an award of attorney's fees. The defendant claims that Lowe admitted at trial that the plaintiff never provided the requisite written notice, which the defendant argues is a condition precedent to any award of attorney's fees.

The court did not address the issue of notice in its May 31, 2011 ruling on the plaintiff's amended application for attorney's fees. This is not surprising, given the fact that the defendant just briefly mentioned the notice issue in its July 21, 2011 objection to the plaintiff's request, and barely mentioned the notice issue at the November 9, 2010 hearing on attorney's fees. At that hearing, the transcript reflects that the defendant's counsel emphasized that the plaintiff failed to differentiate the services provided and that the lease permitted recovery only for services rendered as to particular claims. He also argued that because the court declined to award contractual interest and costs in its October 26, 2010 amended memorandum of decision, consistency required that it decline to award attorney's fees, particularly in light of the fact that the defendant had been partially successful on its counterclaim.

The only reference to the notice provision of the lease was the following remark by the defendant's counsel at the November 9, 2010 hearing: "There's also an interpretation of [paragraph] 19 that notice has to be sent.

It's kind of convoluted, quite frankly. It makes it sound like it could be interpreted as notice has to be given before they could initiate attorney's fees." Such an equivocal statement, without more, did not put the issue squarely before the court as a claim to be seriously considered as a reason to preclude the award of attorney's fees. Clearly, the court did not consider it to be so positioned, because it did not even mention the issue of notice in its ruling. Furthermore, the defendant's counsel did not move for an articulation to have that matter addressed by the court if, indeed, it was a claim that it wanted to pursue.

"It is well settled that [a]n articulation [pursuant to Practice Book § 66-5] is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal. . . . The . . . failure to seek an articulation of the trial court's decision to clarify the aforementioned issues and to preserve them properly for appeal leaves this court without the ability to engage in a meaningful review." (Internal quotation marks omitted.) *Chyung* v. *Chyung*, 86 Conn. App. 665, 676, 862 A.2d 374 (2004), cert. denied, 273 Conn. 904, 868 A.2d 744 (2005).

2

The defendant's next claim is that the court improperly awarded attorney's fees for work not covered by the attorney's fees provision in the lease agreement. The defendant argues that the provisions of the lease do not authorize the recovery of attorney's fees for the time spent by the plaintiff's counsel in seeking repayment of real estate taxes or for services rendered in its

"unsuccessful defense" against the defendant's counterclaim. According to the defendant, no differentiation was made between attorney time recoverable under the lease and other aspects of the case that did not allow such recovery.

The trial court did not find the defendant's arguments at the hearing to be persuasive. It concluded that the amount requested by the plaintiff in its amended application was reasonable and consistent with "the experience, background and results obtained by counsel as well as the issues and problems associated with these issues involved in drafting, pleading and trying this case."

"The general rule of law known as the American rule is that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception. . . . This rule is generally followed throughout the country. . . . Connecticut adheres to the American rule. . . . There are few exceptions. For example, a specific contractual term may provide for the recovery of attorney's fees and costs . . . or a statute may confer such rights." (Internal quotation marks omitted.) *ACMAT Corp.* v. *Greater New York Mutual Ins. Co.*, 282 Conn. 576, 582, 923 A.2d 697 (2007). In the present case, the court determined that there was a contractual provision in the lease that allowed the recovery of attorney's fees by the plaintiff.

Having determined that the court had the authority to award attorney's fees, it was in the court's discretion to determine a reasonable and proper award. "A trial court may rely on its own general knowledge of the trial itself to supply evidence in support of an award of attorney's fees. . . . The amount of attorney's fees to be awarded rests in the sound discretion of the trial court and will not be disturbed on appeal unless the

trial court has abused its discretion. . . . Sound discretion, by definition, means a discretion that is not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law . . . ." (Citation omitted; internal quotation marks omitted.) *Food Studio, Inc.* v. *Fabiola's*, 56 Conn. App. 858, 865, 747 A.2d 7 (2000).

After considering the defendant's arguments, the court, in its discretion, awarded the plaintiff the amount it sought in its amended application for attorney's fees. The defendant has presented nothing to persuade us that the court abused its discretion in awarding that amount. Although the defendant claimed that the services rendered by the plaintiff's counsel had not been "differentiated" or "isolated" in counsel's affidavit, the court did not specifically address that aspect of the defendant's argument. The court may have determined that the legal services could not be further distinguished because the plaintiff's claims in its complaint and the defendant's claims in its counterclaim depended on the same facts and were inextricably intertwined. See, e.g., *Heller* v. *D. W. Fish Realty Co.*, 93 Conn. App. 727, 735, 890 A.2d 113 (2006). The reasoning of the trial court is not apparent in its ruling, however, and it is not the function of this court on review to engage in speculation.

3

The defendant's final claim with respect to the court's award of attorney's fees is that it failed to exercise the requisite discretion in making that award. Specifically, the defendant argues that because the court determined that the plaintiff was not entitled to contractual interest, it was obligated to treat the plaintiff's request for attorney's fees similarly. No case law is cited in support of the defendant's position, nor does the defendant provide this court with a legal analysis of the claim. We,

therefore, decline to afford it review. See *Cooke* v. *Cooke*, 99 Conn. App. 347, 353, 913 A.2d 480 (2007).

## C

The defendant's next claim is that the court improperly awarded the plaintiff costs pursuant to the lease agreement. Specifically, the defendant argues that the court reversed itself by awarding costs in its May 31, 2011 ruling on the plaintiff's amended application for attorney's fees and costs when it initially had declined to award costs to either party in its October 26, 2010 amended memorandum of decision. According to the defendant, "[t]here is no authority for the trial court to reverse its decision as to court costs when acting upon a motion for attorney's fees."

The defendant cites no case law in support of its argument. Moreover, its analysis, which is less than two pages in its brief, is insufficient. "We are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than [mere] abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Cooke* v. *Cooke*, supra, 99 Conn. App. 353. Accordingly, we decline to review that issue.

## D

The defendant's final claim on its cross appeal is that the court improperly failed to award the total amount of damages that it sought on its counterclaim. The defendant argues that the court, in its October 26, 2010 amended memorandum of decision, determined that the defendant had proved it suffered losses of $63,960 as the result of the plaintiff's inadequate electrical repairs following the fire in August, 2002. The defendant claims that the court, in its May 2, 2011 amended articulation, contradicted its original findings by concluding that

the parties were equally responsible for the resulting damages. Citing *Fantasia* v. *Milford Fastening Systems*, 86 Conn. App. 270, 283, 860 A.2d 779 (2004), cert. denied, 272 Conn. 919, 866 A.2d 1286 (2005), the defendant argues that the court improperly changed the reasoning or basis of a prior decision in its subsequent articulation.

Our careful review of the record reveals that the court simply articulated the factual basis for its determination of the amount of counterclaim damages awarded to the defendant in its October 26, 2010 amended memorandum of decision. In that decision, the court did not provide an explanation for its reduction of the proven counterclaim damages by one half. In its May 2, 2011 amended articulation, the court did exactly as it was requested to do. It stated that the basis for the reduction in damages was its finding that both parties were equally at fault for the damages that ultimately resulted from the actions of the plaintiff and the defendant. None of the factual findings in the amended articulation contradicted the factual findings in the amended memorandum of decision; the court merely provided the additional factual basis necessary for the proper review of the claim on appeal. See Practice Book § 66-5.

The judgment is affirmed.

In this opinion the other judges concurred.